We'll hear one more case and then we'll take a morning break. DeMaria v. Sykora. Mr. Vaughn? Yes, Your Honor. May it please the Court, Chris Vaughn, Sinclair Wilson for appellant. Your Honor, in the Court, this is an appeal from a granting a motion for summary judgment on statute of limitations. And of course, under Rule 56, it's a very seemingly narrow issue whether or not a genuine issue of material fact exists and whether or not defendants are entitled to a judgment matter of law based on statute of limitations in this issue being noticed. I don't believe there's any dispute that we have a clear standard as to be applied to that issue by the district court. And the district court There's a four-year statute of limitations and it begins to run when they knew or should have known. That's correct. And in the Volt case, the Ninth Circuit case, the district court may grant a motion for summary judgment on statute of limitations only if the uncontroverted evidence irrefutably demonstrates that a plaintiff discovered or should have discovered a fraud but failed to timely file a complaint after such a discovery. The district court relied upon three facts cited to it by defendants. And which is really not the test. The test is not are there facts which, if taken alone, would support a finding of notice. The question is, is there a genuine issue of material fact? In the briefs before this Court and in the briefs before the district court, it was clearly demonstrated that each of those three facts are not undisputed. I don't understand with regard to the 1986 statement by John F. DiMario to his parents that he believed that there was gold that they were not being shown. My understanding is that Mrs. DiMario agreed that that had occurred. And her only response to it was, I didn't believe them. Well, I think it's much more than that. First of all, this occurs in late 1985. It apparently involves John DiMario showing his parents a picture and saying, this is gold that came from our mine and have you seen it? And the point being this. The record is full before this Court of the existing relationship between the DiMarios and Dick Sikora. They treated him as if he were a son. They trusted him implicitly. He had a key to their house. He took them to get their medications, prescriptions, doctor's appointments, so that that simple fact doesn't occur in a vacuum. And the facts surrounding the context in which that occurred demonstrate that it is not, in fact, an undisputed fact or a controverted fact. What is it? That it happened is not controverted. So the only question would be whether a reasonable person would have taken some investigation or would have been on constructive knowledge despite the fact that they trusted this other person. Which is exactly a fact question for a jury. Why? Because it's a question to determine did they act reasonably or not act reasonably. That's not a matter of law. Why not? Why couldn't it be a matter of law that despite them trusting somebody else, somebody who had all this money at stake would go investigate? Because you have to conclude, in order to reach that conclusion, you have to find that they did not act reasonably. You have to make a factual determination they did not act reasonably. And I also wonder whether that's the standard. I mean, if they have actual knowledge of something or they're looking at something and they agree that this is their goal, which is I gather they did. Well, see, that's the point. They did not agree that this was their goal. They did not believe it was their goal, number one. Number two, they did not believe their son because they were in disputes with their son. They actually consulted Mr. Sikora on advice of how to handle their son. And the record already has the part about trusting him implicitly and so on. And further, once that event takes place, John F. DeMaria signs the 10-year lease. If he genuinely believes, allowing Mr. Sikora to go on with this conduct. So the son himself signs the 10-year lease after he made the agreement. Well, the impression one gets is that they didn't want to believe that Mr. Sikora would cheat them. Well, they did not believe that Mr. Sikora would cheat them. And they did not believe that. In light of the statements by their son that Mr. Sikora was not showing them all the gold that had been removed from the mine. Well, testimony is he showed him a picture or a magazine from the person who was selling the gold, not quoting Mr. Sikora, claiming that this is a picture that the person selling the gold says came from their mind, which wasn't referred to their mind by name. By the way, I really couldn't tell. As I understood it, they would present 10 pieces of gold. Several hundred. They'd then be grouped by type or size. By type and category. And they would present one at a time. What was the value of all of that? How much were the plaintiffs, were the DeMaries receiving from that? Well, there is some dispute about how much they ultimately sold that for, and there's some contention that they didn't sell it for fair market value and those sort of things. There were certainly over the beginning of 1975 when the first lease started, all the way up to 1986 when it became a 10-year lease, and through until 1992, there were certainly, it would certainly be tens of thousands of dollars that were selected, one out of every ten. But it's reasonable to think that one would be concerned if they weren't getting all of what was due them under the agreement. I would think that if they had reason to believe that Mr. Sikora, who they had all this relationship with and essentially a familial relationship with, as if he were a son, if they believed that he was not being truthful with them, the testimony is that I trusted him implicitly. You know, key to my house, felt he was more of a son than my son was to us. He was always there to help us. He was always there so quick anytime we needed anything. But in answer to the court's question, there was certainly, there's no fixed number of times a year there would be a split. Some years, no split. Some years, maybe more than one split. The same procedure was used throughout. Mr. Sikora would bring the gold, lay it out, collectively they would group it by category, and then one of ten would be selected as a royalty. So with regard to, we've covered the John F. statement. Did the court have any other questions on that before I went on? Was it Mr. Christmas or Mr. Poop's name? Mr. Christman, yes. Mr. Christman testified, well, first of all, Mr. Christman testified sometime after Mildred DeMaria died. So there's no way for Mildred to put in evidence anything to dispute that specifically. She's now deceased. Mr. Christman testified, number one, inconsistently within his own deposition testimony, saying four or five years ago when he was deposed in June of 2002, and later under leading questions, which would have put it within the statute, is the point, that if it was, in fact, But that's not unusual. I mean, I couldn't tell you anything whenever that happened, two years or ten years, but I can tell you by some benchmark when it occurred. And that's what he basically did. Right. No, he did not. What he testified to was a question of, was it still during the time they had a lease with Socorro? There's no foundation that says Christman ever knew they had a lease, or if they did, when it was in effect. So part of the issue here is Christman, number one, is not a credible witness. Number two, testified inconsistently within his own deposition. One set of facts putting it within the statute. One set of facts under a leading question without foundation taking it out of the statute. He didn't know that Mr. DeMar was unable to operate the mine in his later years? I'm sorry? Is there any evidence in the record that Christman did not know that Mr. DeMar was unable to operate the mine, run the mine, in his later years? I don't know that specifically one way or the other. I believe that there is evidence that he knew Socorro was mining on behalf of the DeMarias. But he didn't know. He didn't know about the lease and the arrangement. No, exactly. Or whether it was in effect. Because the question is, was the lease still in effect when he saw this gold and told her this? Well, obviously for that to be a question that he can answer, he has to have a factual basis to do that. I'd like to reserve the rest of my time if I could, Your Honor. Okay. Thank you. Good morning. Paul Langelehu. I'm appearing on behalf of the Lights and Cristale. We were the moving parties originally for the summary judgment down below. Just to start briefly with Mr. Vaughan's suggestions, he confuses the existence of the fact that there is an issue between the parties with whether or not there is a material fact in dispute. He also suggests that because the relationship with the Socorros is such that it would defeat the notice that was given by the son, the Pinque v. Andrews case cited in our brief says that that wouldn't matter even if the parties stood in a fiduciary relationship to each other. Constructive notice in that case was sufficient. Here our argument is actual notice. What they were given was not proof of anything. It was something that led John F. to be suspicious. But if one were otherwise trusting this individual, I mean, you could look at this and say, well, this doesn't demonstrate that. It doesn't say it's from our mind. How do we know it's from our mind? Exactly. And that would be a factual issue. The issue here for the statute of limitations granting of the summary judgment is whether or not that notice is sufficient. Is it actual knowledge? Actual knowledge is when someone comes to you and says that you are being cheated. Here is proof of you being cheated. You know you're entitled to 10 percent of the gold, but you're not getting it. That's what I was just saying. This certainly isn't actual knowledge. It's a best constructive knowledge, right? We don't believe so. We believe that it's actual knowledge because. But the document didn't say this is from you. Yes, that is what the testimony was by the plaintiff, Mildred, in her deposition. Testimony? I'm sorry? Is there any other testimony? No other testimony. Well, in fact, the son also testified consistently with that. He said he showed his father pictures, said you haven't seen this gold. Therefore, you're not seeing all the gold that Sikora is mining. But he didn't say that he knew that that was the gold from the mine. He just pretty much suspected it was. That's not my understanding of the testimony. My understanding of the testimony was he was showing him gold that was labeled from the DeMaria mine from Michigan Bluff that it had come from. In the ad? Or in the photographs that was labeled from the DeMaria mine? I believe it was labeled Michigan Bluff, but we haven't obtained those photographs that he specifically showed his parents in 85. Well, what evidence in the record shows that he knew, that the son knew that that gold was from the family mine? It was his supposition that it was. So it's just how can that possibly be actual notice? Actual notice would be the allegation here is a RICO conspiracy. And if he is saying that there is a conspiracy going on, that you are being cheated, whether he knows or not. We're talking about the discovery rule for delaying the statute of limitations. Exactly. Whether they knew or should have known. Or should have known. That's constructive notice. The constructive notice is the should have known. Would a reasonable person have been put on notice? The actual notice is when their son comes to them and says, this is what's going on. Making this case harder for your son than you need to. The second notice is when Mr. Christman says exactly the same thing. He says, Mildred, you are entitled to these royalties. He did know of the lease. Because when he speaks in his deposition, when I cleared that up with him, he knew that she was entitled to royalties from the lease. But, again, he was, as I understand it, even more clearly than John F., was looking at these magazines and pictures and just logically deducing that it was probably from the mine. But they weren't labeled as being from his mine. No. Mr. Christman, his testimony was based on his knowledge of the gold being mined in that area. And, excuse me, what he saw being sold from the golds being mined in that area. This particular mine is one of the most significant gold-producing mines in that area for specimen gold. And because he felt he saw too much of it on the market that the DeMarias weren't getting enough of a split. And so he tells Mildred as early as 92. Then Mildred's attorney tells her exactly the same thing. And when they write the contract for sale of the mine. Where is there evidence that the attorney told her anything? The sale of Mildred's interest in the mine is a contract written by her attorney where she. . . There's no evidence that the attorney told her anything, is there? Within that contract that the attorney drafts for Mildred, it says that she is to be indemnified in the event that her son sues for the diversion of golds is what it's been called. That they weren't shown all of the golds that they were entitled to. It doesn't use those words, diversion of golds. Those are the terms that we've been using throughout the lawsuit. It doesn't say. . . That's not what's contained. . . I don't think. . . If I recall that document. . . I don't recall that being what was contained in the. . . No, the document. . . The sales document says that there is potential litigation over the lease payments. The only lease payments that were due in Owing were the ones that Socorro was making. But that was a dispute. It had to have been a dispute between her and her son. So apparently there was some allegation that she was deporting her son, not that Socorro was. But you see. . . I don't think it's. . . I mean, I think this document is the weakest piece you have because it really doesn't say very much. But, Your Honor, we're putting all three of those in the context of what would a reasonable person do? A reasonable person who was told by their son, told by their friend, who was completely independent in the case, and told by their attorney. But you don't have no proof that they were told by their attorney. You have a document that's completely vague. The document states specifically that there is potential for litigation between the parties. With her son. With her son. With respect to lease payments, which does not imply her son. Which is very adversely affecting her health and peace of mind. Absolutely. She had problems with her son, and they go back. But that doesn't change what we consider actual knowledge, or even in the lesser standard, constructive knowledge. Would a reasonable person at this point have done something? Let me just ask you. Is the section we're looking at, paragraph 4, litigation, potential litigation? Yes, ma'am. All right. Well, what it says is that the dispute is about her husband's and father's estate. That's what it says. There are serious disagreements as to the probate of her husband and father's estate, the main details of which are well known to the parties here, too. And she wants to avoid distressing litigation, and so, therefore, whatever. It's just no demonstration, whatever, that it has anything to do with this dispute. What it demonstrates is that these were elements that she was aware of, and that she can't deny actual knowledge. But the constructive knowledge prong also exists, that a reasonable person would have been put on notice at that point. With this? With all three elements put together. Not by this alone? Not by this alone. But this is the cutoff date. And 92 is an important cutoff date because it cuts off any further damages that she may have. Once her damages are excluded, the Amman case, State Farm v. Amman, looks back from the date of filing four years. If there are no damages from any predicate acts from four years before the filing, then the plaintiff is cut off from further pursuing litigation. That's what we have here. This is Judge Hawkins. Is inquiry notice enough? Yes, Your Honor.  And if she does nothing, and there is no evidence that she did anything other than get herself an indemnification agreement in her contract for sale of the mine, that's the only thing we know that she does between the time she was told of the alleged conspiracy and the time that she files the lawsuit. Do you happen to know, without having to look for it, where on the record John F.'s discussion of the 1985 incidents are? It's in his deposition testimony, which I believe is in our excerpt of the record. Okay. Thanks. By the way, there was related state court litigation. Is that correct? That's correct. The state court litigation was dismissed. Were any of these claims sort of involved in that state court litigation? Yes, sir, they were. The specific issue that counsel has brought up in his brief, that there are ongoing injuries, are related to the state causes of action, not the RICO cause of action. The RICO cause of action is what Judge Burrell decided this case on, that if there's no damages four years before the filing of the action, and there's no lawsuit after she had reasonable notice or what we consider actual notice, then they have blown the statute of limitations on the RICO action, and his claim that she's receiving ongoing injuries from the failure of the rescission of the original sale doesn't apply, because those are state causes of action. Under the RICO statute, she has lost her cause of action here. Was the estate part of the state court litigation? Yes, sir, it was. As long as the son? No, the son brought a separate action and lost. He brought his action. Actually, he sued his mother in that same action, in his cross-complaint. So he went up, he lost at trial, he lost on appeal, and the California Supreme Court refused to hear. So that action's... What's the status of the state court litigation involving the estate? Yes. In our case, it was dismissed by the plaintiff on the eve of trial to restart the RICO action in federal court. I see. Okay. Thank you. Kick-in, please. One minute. Appellee's court, Richard Corbin for Appellee's Sikora. The court has asked about that contract and what we should focus on. And in the Appellee's Sikora's brief, paragraph five of the sale contract says, there's potential litigation over the distribution of the entire gold proceeds of the mine, although none is now pending. That was very prophetic, because in 1997, John F., the son, did sue Richard Sikora, Mrs. Sikora, his mother Mildred, and his father John R.'s estate for diversion of gold. So that was the lawsuit that we're talking about that was unsuccessful in the court. When did he file that lawsuit? He filed it in 1997, sir. And I want to address just one issue that was in the reply brief of the appellants. And that was that the four cases cited by Appellee's indicates there needs to be correspondence to have constructive notice. Indeed, we have something much better than that here. We have the only son they have, Mildred and John R., John F., coming to his parents and saying, Parents, here's a picture of gold. He knows the gold from the mine. It's a very specific type of gold that's not matched in crystalline form basically anywhere in the world. And he says, This gold is from this mine, and Richard's cheating us out of our share of the gold when he brings it. He doesn't bring it all. That would put him on constructive notice of any of the theories, whether it's a storm warning theory of the Sixth Circuit or the Third Circuit theory of exciting ones, suspicion, or under the injury discovery. It would put them on notice to say, Mr. Sikora, what about this picture that our son shows us? Can you just tell us? They never approached him. Then when a very close family friend comes to her after John R. dies and before she sells the mine to Mr. Sikora and says basically the same thing, you have a compounding. Then when you have the family attorney putting that clause that I just recited to you, that there is potential litigation over these gold proceeds, and has her identified. Now, his logo is on all four pages of that contract. You can see her attorney's firm's logo is on there. How much more would this court need, please? The only son, family friend, and the lawyer and confidant saying, Look, there's going to be a problem. She is bound then to go to Mr. Sikora and say, Mr. Sikora, what about all this? And she never did. I'd submit it. Thank you very much. Okay. Thank you. One minute. We have about one minute to reply. First of all, with regard to Judge Hawkins' question, inquiry notice is not the standard here as acknowledged in Sikora brief. It is the injury discovery rule the Ninth Circuit has followed for more than two decades that set forth in all the briefs acknowledged. Do or should have known. Yes, sir. Okay. What's the difference between should have known and inquiry notice? Well, the inquiry notice that I'm referring to is the Third Circuit standard, which I believe is distinguishable from the injury discovery standard in the Ninth. I'd like to know how. I couldn't quite figure that out. Well, it was distinguished in our brief, but it was this whole idea of a storm warning that something's happening on the rise and something's coming. I don't think that's injury discovery. That's not knew or should have known. That's just something about it. Presumably it means that somebody getting this information would have looked into it and found out X. Well, even if that's the case, then you still don't meet that test here because what the son shows him is a magazine which has an article by the broker seller, not by Socorro. It calls the gold by a completely different name. It doesn't identify it as DeMaria gold. It doesn't identify who the miner is. It doesn't identify anything that would tie it to this mine, to their mine. And at the same time, you have this relationship with Socorro. Did the son have any interest in making sure that the parents were getting their fair share of the gold? Only if they were going to lend him the money. I mean, that's all he did was borrow money and take money from them. Maybe it was so the bank had money to give him. Did he have any interest of his own in that time? And, in fact, he is mining. And, in fact, that's the reason that the agreement says there's going to be litigation about the entire production of the mine. Well, I don't understand that response to be responsive to Judge Brisson's question. Did he have an interest in the mine at that time? He was mining. He was mining on the mining claims. But my understanding is that what he was saying was that I am owed money. You are owed money. And from what you get, I am owed money. And I believe I'm not getting what I should be getting. But I'm not accusing you. I'm accusing him. That's what I understood him to be saying. He wasn't being a philanthropist here, right? He had some interest in this money that he claimed wasn't coming. He had interest in the money that he claimed wasn't coming.
judges: Hawkins, Paez, Berzon